UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN RAY AKI, | Case No.  13-cv-04027-JSC |
| Plaintiff, | |
| v. | **ORDER ON MOTION FOR SUMMARY JUDGMENT** |
| UNIVERSITY OF CALIFORNIA LAWRENCE BERKELEY NATIONAL LABORATORY, | Re: Dkt. No. 27 |
| Defendant. | |

Plaintiff Julian Ray Aki ("Plaintiff"), a former Field Carpenter for the University of California's Lawrence Berkeley National Laboratory ("LBNL"), brings this action against his former employer in the form of Defendant The Regents of the University of California ("Defendant")[1] under the Rehabilitation Act of 1973 (29 U.S.C. § 794), the California Confidentiality of Medical Information Act (Cal. Civ. Code §§ 56 et seq.), and Article 1(1) of the California Constitution.  Plaintiff's Complaint alleges five causes of action: (1) disability discrimination; (2) failure to accommodate; (3) retaliation; (4) violation of the Confidentiality of Medical Information Act; and (5) violation of the California constitutional right to autonomy and privacy.  Now pending before the Court is Defendant's Motion for Summary Judgment.  (Dkt. No. 27.)  After carefully considering the evidence submitted by the parties, and having had the benefit of oral argument on November 13, 2014, the Court GRANTS Defendant's Motion in part and DENIES in part.

## BACKGROUND

Plaintiff first began doing carpentry work for LBNL in 1995 as an outside contractor. (Dkt. No. 27-2 Ex. A at 29:19–20 ("Aki Dep.").)  His duties included building retaining walls,

---

[1] The Regents of the University of California is the legal entity subject to suit for the Lawrence Berkeley National Laboratory.

cutting stairs, basic framing, dropping ceilings, putting up shelves, and other maintenance work at various locations around the LBNL site.  (*Id.* at 22:4–9.)  In 2001, Plaintiff was hired as a permanent, full-time Field Carpenter for LBNL.  (*Id.* at 29:19–23.)

Plaintiff estimates that he was six years into his employment with LBNL when he first injured his foot on the job.  (Dkt. No. 30 ¶ 4 ("Aki Decl.").)  Due to this injury, Plaintiff took time off on worker's compensation before returning to his position as a Field Carpenter.  (*Id.*)  Upon his return, Plaintiff was allowed to wear protective construction boots—as opposed to steel-toed boots—until his foot fully healed.  (*Id.*)  Plaintiff claims that throughout his employment he observed other carpenters wearing construction boots rather than steel-toed boots.  (*Id.*)

On July 30, 2009, Plaintiff disclosed to his supervisor John Tully ("Tully") that he was using illicit drugs outside of work.  (*Id.* ¶ 5.)  Plaintiff confided in Tully because he wanted to be referred to LBNL's Employee Assistance Program.  (*Id.*)  As a result of this disclosure, Mark Levit ("Levit"), LBNL's Construction Services Manager, sent Plaintiff a letter dated August 18, 2009 that stated:

> On July 30, 2009, you disclosed to your supervisor that you have a substance abuse problem. As a condition of your continued employment, and for the safety of yourself and others, you are required to obtain prompt treatment by August 24, 2009 . . .
>
> It is essential that the Laboratory be kept informed during your treatment. You must complete the appropriate release forms at the treatment center to authorize their communication with me about the type of program you will be attending, whether you are following the treatment plan, and when you have successfully completed the program . . . .
>
> Once you have successfully completed the treatment program, please contact us to schedule a drug test. Other conditions, such as random drug testing, may also be required upon your return. Failure to follow the treatment plan or to pass the drug test may result in discipline up to and including dismissal from Laboratory employment.

(Dkt. No. 27-2 Ex. C.)  This letter was copied to Tully, two other supervisors, Plaintiff's physician, and Plaintiff's union representative Mary Morman ("Morman").  (*Id.*)  Plaintiff did not agree with the characterization of his drug use as a "substance abuse problem," but agreed to seek treatment as a condition of his continued employment.  (Aki Dep. at 40:5–18.)

After undergoing 30 days of inpatient treatment at New Bridge Foundation, Plaintiff

returned to work on or around October 7, 2009.  (*Id.* at 43:17–19, 48:1–5.)  As a condition of his

return and continued employment, Plaintiff signed a "Drug and/or Alcohol Testing Consent Form"

that authorized LBNL to require Plaintiff to:

> • Do random urine screens twice a month for the first three months.

> • Do monthly random urine screens for a minimum of 6 months or longer after the first three months as determined by New Bridge Foundation.

> • Attend an after care program at Now Bridge Foundation for approximately 10 1/2 months or longer as determined by New Bridge Foundation.

> • Submit and test negative once a month to one urine screen administered by New Bridge Foundation aftercare program.

(Dkt. No. 27-2 Ex. D.)  Along with Plaintiff, both Morman and LBNL representative Victor

Roberts signed the consent form.  (*Id.*)  Plaintiff continued receiving out-patient care once a week

at New Bridge Foundation until October 2010.  (Aki Dep. at 48:17–24.)

Plaintiff submitted to his first drug test within a month of signing the consent form, and

underwent an estimated total of four tests within a six month period.  (*Id.* at 50:19–22, 55:13–18.)

According to Plaintiff, these tests were conducted "by an outside contractor in very public places

like public bathrooms, cubicles, conference rooms with doors open, [and] hallways."  (Aki Decl. ¶

6.)  On at least one occasion, Plaintiff was instructed to wait in a public hallway while holding a

plastic cup of urine while employees who recognized him passed by.  (Aki Dep. at 60:5–11.)

Plaintiff felt that it was unfair to be tested on location in front of other employees when he was

already being tested off-site at New Bridge Foundation, so he met with Morman to file a grievance

for the way LBNL performed its drug tests.  (*Id.* at 59:1–5, 70:2–3, 80:14–23.)  Morman filed the

grievance on Plaintiff's behalf on June 16, 2010, alleging that Plaintiff's privacy and

confidentiality had been breached and recommending that all drug testing be kept private and

confidential.  (Dkt. No. 30 Ex. B.)  Plaintiff also filed a disability discrimination complaint with

the California Department of Fair Employment and Housing ("DFEH") on the same date.  (Dkt.

No. 30 Ex. C.)

In March 2011, Plaintiff began seeking treatment for a toe injury.  (Aki Dep. at 89:10–12.)

Plaintiff eventually took worker's compensation leave in July 2011, as the cartilage in his toe was

United States District Court
Northern District of California

3

severely damaged from wearing steel-toed boots and required surgery.  (*Id.* at 10:1–10.)  Dr. Barry

Meskin cleared Plaintiff to return to work on February 7, 2012, classifying him as "permanent and

stationary"[2] with the following work restrictions: (1) standing or walking limited to four hours a

day; (2) limited kneeling or squatting; (3) Plaintiff required a "sit down job;" and (4) Plaintiff

could not wear steel-toed boots.  (Dkt. No. 27-2 Ex. E.)  Plaintiff claims that, upon his return to

work on February 7, the only restriction he requested from his supervisor William Mattson

("Mattson") was to wear protective construction boots rather than steel-toed boots, as he had done

with his prior injury.  (Aki Decl. ¶ 9; Aki Dep. at 91:13–18.)  While the record is somewhat

unclear, it appears that Plaintiff was allowed this accommodation and began work wearing

construction boots for at least a couple of days.  (Aki Decl. ¶ 9; Aki Dep. at 91:13–18.)

In a letter dated February 8, 2012, LBNL's Return-to-Work Specialist Adel Serafino

("Serafino") wrote to Plaintiff to schedule a meeting "to determine if [his] department/division

[could] make an accommodation that [would] reasonably allow [him] to perform [his] essential

job functions."  (Dkt. No. 27-2 Ex. F.)

Two days later, on February 10, Plaintiff met with Serafino, Mattson, and another LBNL

representative.[3]  (Aki Dep. at 98:20–99:9.)  Serafino explained to Plaintiff that her job was to

accommodate employees who could no longer work at their current position, and assist them in

finding a position where they could maintain employment with LBNL.  (*Id.* at 99:23–1.)  Aside

from this acknowledgment, however, Plaintiff's account of the February 10 meeting is somewhat

unclear as to whether: (a) all four of Plaintiff's work restrictions were discussed; and (b) there was

any discussion regarding other jobs skills and available jobs at LBNL.

As to Plaintiff's work restrictions, at his deposition Plaintiff could not recall whether any

---

[2] "'Permanent and stationary status' is the point when the employee has reached maximal medical improvement, meaning his or her condition is well stabilized, and unlikely to change substantially in the next year with or without medical treatment."  Cal. Code Regs., tit. 8, § 9785(a)(8).

[3] In a letter to Plaintiff dated April 9, 2012 ("Jang Letter"), Acting Maintenance Manager Michael Jang described LBNL's account of the February 10 meeting.  (Dkt. No. 27-2 Ex. H.)  To the extent Defendant seeks to introduce the letter for the truth of its assertions about what took place at the February 10 meeting, the letter is inadmissible hearsay that does not fall within any exception. *See* Fed. R. Evid. 801–802.  As Defendant conceded at oral argument, the only admissible evidence in the record regarding what occurred at the meeting is Plaintiff's declaration and deposition testimony.

United States District Court
Northern District of California

of the four work restrictions were discussed at the February 10 meeting other than steel-toed boots.  (*Id.* at 100:11–101:4.)  In his declaration, however, Plaintiff unequivocally asserts that the "only thing discussed at this meeting was whether [he] could wear steel-toed boots as opposed to protective construction boots," and that he told Serafino and Mattson that he would be satisfied with that sole accommodation.  (Aki Decl. ¶ 10.)  Serafino told him that "because [he] couldn't wear the steel-toed boots, [he] couldn't perform as a carpenter because that was part of the safety equipment [he] must wear, and . . . to her knowledge [he] . . . didn't have any other skills or qualifications for any other jobs that might be available."  (Aki Dep. at 100:4–10; *see also* Aki Decl. ¶ 10.)

The record is also unclear as to whether the February 10 meeting involved any meaningful discussion about alternative job skills and available positions at LBNL.  At his deposition, Plaintiff admitted that Serafino explained how LBNL would help him look for another available job, and that they discussed Plaintiff's job skills apart from carpentry.  (Aki Dep. at 101:9–102:6.)  Plaintiff did not recall if Serafino asked if he "had any other skills," but "more than likely she did."  (*Id.* at 101:22–23.)  Similarly, while not explicitly admitting to telling Serafino that he did not have any skills other than working in "the trades," Plaintiff agreed that this was an accurate assessment and is something he "would probably say."  (*Id.* at 101:24–102:5.)  Notwithstanding this testimony, however, Plaintiff's declaration states that the LBNL personnel present "never said they were going to look for other jobs, no other jobs were discussed, no other work restrictions were discussed, and there was absolutely no discussion nor exploration of other work options."  (Aki Decl. ¶ 10.)  Plaintiff now claims that he "never told anyone at that meeting that [he] had no other job skills, because the subject never came up, and it is not true."  (*Id.*)

The February 10 meeting ended with LBNL advising Plaintiff that if he had no other skills and if LBNL could not find another job available for him, the next step would be medical separation.  (Aki. Dep. at 103:2–6.)  At the time, Plaintiff did not voice any opposition to this assessment, because he "couldn't wear steel-toed boots any longer and that's the sum of it."  (*Id.* at 103:11–19.)  It is not apparent from the record whether Plaintiff continued working after the February 10 meeting.

On March 29, 2012, Plaintiff wrote to Serafino formally requesting a reasonable

accommodation.  (Aki Decl. ¶ 11; Dkt. No. 27-2 Ex. H.)  Plaintiff claims that he did not confine his request to the Field Carpenter's position, and was willing to be placed in any job to maintain employment at LBNL.  (Aki. Decl. ¶ 11.)  Serafino never responded to the letter.  (*Id.*)

Acting Maintenance Manager Michael Jang wrote a letter to Plaintiff dated April 9, 2012 ("Jang Letter"), that notified him of LBNL's intention to medically separate him from his employment.  (Dkt. No. 27-2 Ex. H.)  The letter stated that LBNL was "unable to identify a different position for which [Plaintiff] might be suitable."  (*Id.*)  The letter also provided Plaintiff with the opportunity to respond to LBNL's decision by April 24, 2012.  (*Id.*)  Following receipt of the Jang Letter, Plaintiff contacted union representative Morman to protest the termination and file a grievance.  (Aki Decl. ¶ 12.)  Plaintiff never heard back from Morman.  (*Id.*)

On August 29, 2013, Plaintiff filed a complaint against LBNL alleging: (1) disparate treatment in violation of the Rehabilitation Act (29 U.S.C. § 794); (2) failure to accommodate in violation of the Rehabilitation Act (29 U.S.C. § 794); (3) retaliation in violation of the Rehabilitation Act (29 C.F.R. §§ 1630.8, 1630.12); (4) violation of the California Confidentiality of Medical Information Act (California Civil Code §§ 56 et seq.); and (5) violation of the right to autonomy and privacy (Article 1(1) of the California Constitution).  (Complaint ¶¶ 27–57.)  Now pending before the Court is Defendant's Motion for Summary Judgment.  (Dkt. No. 27.)

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  To persuade the Court that there are no genuine issues of material fact, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Id.*

If the "moving party carries its burden of production, the nonmoving party must produce evidence to support its claim." *Id.* at 1103. Should the nonmoving party fail to do so, "the moving party wins the motion for summary judgment." *Id.* "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Id.* In deciding whether there exist genuine issues of material fact, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

## DISCUSSION

## I.    EVIDENTIARY ISSUES

### A.    Defendant's Objections to the Aki Declaration

As a preliminary matter, Defendant urges the Court not to consider Plaintiff's declaration in opposition to summary judgment ("Aki Declaration") on the grounds that it (a) directly contradicts his prior testimony and (b) is time-barred by the Local Rules. (Dkt. No. 31 at 2–3.)

#### 1.    Prior Contradictions

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). At the same time, "every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence." *Id.* Before invoking what is known as the "sham affidavit rule," a district court "must make a factual determination that the contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (internal citations and quotation marks omitted). Neither of the two supposed contradictions that Defendant identifies meets this standard.

Defendant first claims that the Aki Declaration is sham because it "alleges for the first time that he did not agree with LBNL's decision to medically separate his employment." (Dkt. No. 31 at 2.) The language that Defendant appears to take issue with is Aki's declaration statement— when describing the February 10, 2012 and his later correspondence with Serafino—that he "didn't want to be medically separated from employment at LBNL and [he] didn't agree to it." (Aki Decl. ¶ 11.) Defendant claims that this directly contradicts his deposition testimony, where

Plaintiff testified:

> Q: You were aware at the end of that meeting that the next step would be a medical separation?
>
> A: Yes, ma'am.
>
> Q: Did you disagree with that assessment?
>
> A: At the time, no.
>
> Q: You agreed that a medical separation was appropriate at that time?
>
> A: Yes, because that's-- I couldn't wear steel-toed boots any longer and that's the sum of it.

(Aki Dep. at 103:11–19.)

This minor discrepancy does not rise to a "clear and unambiguous" contradiction indicating a sham. One can agree with the reasoning behind an assessment without agreeing to its outcome. Moreover, the context of each statement is different. In the deposition, it appears that Plaintiff is discussing whether he voiced his opposition to LBNL's assessment at the February 10 meeting. In his declaration, Plaintiff is discussing Jang's April 9 letter and his disagreement with LBNL's ultimate decision to medically separate Plaintiff. Finally, whether Plaintiff believed LBNL was justified in terminating his employment at the February 10 meeting is of minimal, if any, relevance; the law does not preclude an employee from challenging an adverse employment action if the employee had previously been ignorant of the unlawful basis for the action. Thus, this example is not an appropriate basis for disqualifying the Aki Declaration.

Defendant additionally argues that the Aki Declaration is demonstrably false because it states that when Plaintiff returned to work on February 7, 2012, "there were no work restrictions in place, so [he] actually worked without any restrictions, including wearing steel-toed boots." (Aki Decl. ¶ 9.) Defendant claims that this contradicts undisputed evidence that Dr. Meskin released Plaintiff to return to work with significant restrictions. (*See* Dkt. No. 27-2 Ex. E.) The sham affidavit rule applies only when a party's declaration "contradict[s] *his own* prior testimony." *Yeager*, 693 F.3d at 1084 (emphasis added). Because Dr. Meskin's report is not Plaintiff's testimony, it too cannot serve as a basis to disqualify Plaintiff's declaration.

United States District Court
Northern District of California

2.    **Time-Barred**

Local Rule 7-3 provides that any "opposition must be filed and served not more than 14 days after the motion was filed."  Civil L.R. 7-3(a).  Defendant does not dispute that Plaintiff filed his opposition within the 14-day deadline, but because the Aki Declaration was filed one day later—after the deadline had expired—Defendant seeks to strike the declaration as untimely. (Dkt. No. 31 at 3.)  Plaintiff has proffered an excuse for why the affidavit was late, and because Defendant has not shown how this minor delay has prejudiced its position, the Court declines to strike the Aki Declaration on this basis.  *See Cai v. Fishi Cafe, Inc.*, No. C-05-03175 EDL, 2007 WL 2781242, at *1 n.2 (N.D. Cal. Sept. 20, 2007) ("Although the opposition and declaration were filed one day . . . the Court declines to strike them for that reason, particularly since Defendants have shown no prejudice as a result of the late filing.").  Defendant's objections to the Aki Declaration are thus overruled.

B.    **Plaintiff's Objection to Defendant's Exhibit G**

Defendant attaches to its counsel's declaration a spreadsheet of positions purportedly available at LBNL in February 2012 ("Exhibit G").  (*See* Dkt. No. 27. Ex. G.)  Plaintiff objects to the admissibility of this exhibit on the basis that it lacks foundation and is hearsay.  (Dkt. No. 33 at 1.)  Defendant argues that Exhibit G is a self-authenticating document under Federal Rule of Evidence 901(b)(4), that it is not used for the truth of the matter asserted or, alternatively, falls under the business records exception.  (Dkt. No. 34 at 2.)  Even if the spreadsheet is distinctive enough to be self-authenticating—which is arguable—Exhibit G constitutes hearsay in that it is an out of court statement used to show what jobs were available at LBNL in February 2012.  The spreadsheet does not fall under the business records exception to the hearsay rule.  Under that rule, the proponent must show that

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; [and]

> (C) making the record was a regular practice of that activity

Fed. R. Evid. 803(6); *see also United States v. Catabran*, 836 F.2d 453, 457 (9th Cir. Cal.1988)

("The proponent of the business records must satisfy the foundational requirements of the business records exception."). These foundational facts must be "shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification." *Id.* Because Defendant fails to establish any of the foundational facts required for application of the business records exception, Exhibit G is not admissible under that exception to the hearsay rule.

## II.   MERITS

### A.   Disability Discrimination/Failure to Accommodate (First and Second Causes of Action)

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To state a *prima facie* case for disability discrimination under the Rehabilitation Act, a plaintiff must establish that: (1) he suffers from a disability; (2) he is "otherwise qualified" for employment; (3) he suffered discrimination as a result of his disability; and (4) the defendant receives federal financial assistance.[4] *See Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1058 (9th Cir. 2005). If the plaintiff can establish a *prima facie* case, the burden "then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123–24 (9th Cir. 2000). If the employer does so, the plaintiff must then show that the articulated reason is pretextual. *Id.* at 1124. Here, Plaintiff bases his discrimination claim on Defendant's alleged failure to provide him a reasonable accommodation. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) ("A failure to provide reasonable accommodation can constitute discrimination under section 504 of the Rehabilitation Act.").

A "qualified individual" under the Rehabilitation Act is an individual with a disability "who, with or without reasonable accommodation, can perform the essential functions of [the] position." *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1175 (9th Cir. 1998); *see also* 42

---

[4] Defendant neither disputes that Plaintiff suffers from a disability nor that LBNL receives federal funds. Additionally, because LBNL based Plaintiff's medical separation (an adverse action) on his inability to work, Defendant only challenges Plaintiff's status as a "qualified individual."

U.S.C. § 12111(7).  Under Section 504, the "plaintiff has the burden of demonstrating he is otherwise qualified for the position in question." *Voytek v. Univ. of Cal.*, No. C-92-3465 EFL, 1994 WL 478805, at *11 (N.D. Cal. Aug. 25, 1994).  A "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."  42 U.S.C. § 12111(8).[5]

"Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Memorial Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001); *see also* 29 C.F.R. § 1630.2(o)(3).  "[E]mployers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000) (en banc), *vacated on other grounds*, 535 U.S. 391 (2002). "The question whether this failure should be excused because there would in any event have been no reasonable accommodation available is one as to which the employer, not the employee, should bear the burden of persuasion throughout the litigation." *Morton v. United Parcel Serv., Inc.*, 272 F.3d 1249, 1256 (9th Cir. 2001), *overruled on other grounds, Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007); *see also Dark v. Curry County* , 451 F.3d 1078, 1088 (9th Cir. 2006) (if the defendant does not engage in the interactive process, then summary judgment may be granted in its favor "only if a reasonable finder of fact *must* conclude that "there would in any event have been no reasonable accommodation available." ) (quoting *Morton,* 272 F.3d at 1256); *Ambrose v. J.B. Hunt Transport, Inc.*, (D. Or. Feb. 13, 2014) (denying defendant's motion for summary judgment because it had not engaged in the interactive process or proven that in no event there would have been no reasonable accommodation available).  "[T]he task of proving the negative—that *no* reasonable accommodation was available—rests with an offending employer throughout the litigation, and [], given the difficulty of proving such a negative, it is not likely that

---

[5] "The standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act." *Coons v. Sec'y of the U.S. Dept. of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004).

United States District Court
Northern District of California

an employer will be able to establish on summary judgment the absence of a disputed fact as to this question." *Morton*, 272 F.3d at 1256 n.7.

Here, the dispute of whether Plaintiff was a "qualified individual" ultimately centers on whether (1) Defendant participated in the interactive process in good faith and (2) whether Defendant could have provided Plaintiff with an available reasonable accommodation. Because the Court cannot, as a matter of law, rule in Defendant's favor on those two questions, Defendant's Motion for Summary Judgment is DENIED on the Rehabilitation Act claim.

### 1.    Interactive Process

The interactive process is "at the heart" of the ADA and "is the primary vehicle for identifying and achieving effective adjustments which allow disabled employees to continue working without placing an 'undue burden' on employers." *Barnett*, 228 F.3d at 1113. "This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3); *see also Barnett*, 228 F.3d at 1115 ("[E]mployers must consult and cooperate with disabled employees so that both parties discover the precise limitations and the types of accommodations which would be most effective.). If an employer fails to engage in the interactive process in good faith, they may be held liable "if a reasonable accommodation would have been possible." *See Barnett*, 228 F.3d at 1116.

Whether Defendant participated in the interactive process in good faith is a disputed question of fact. Specifically, the parties dispute (i) whether the February 10, 2012 meeting between Plaintiff and LBNL staff produced any meaningful discussion about possible accommodations for Plaintiff's toe injury; and (ii) whether other available jobs at LBNL were discussed or investigated.

### i.    Possible Accommodations

Plaintiff asserts that the "only thing that was discussed at th[e] [February 10] meeting was whether [he] could wear steel-toed boots as opposed to protective construction boots." (Aki Decl. ¶ 10.) At the meeting, he allegedly told LBNL personnel "that [he] would be satisfied just being able to wear protective construction boots instead of steel-toed [sic] boots." (*Id.*) LBNL responded that such an accommodation was unavailable and, as a result, "there was no job for

[him]." (*Id.*)  Plaintiff further contends that "no other work restrictions were discussed, and there was absolutely no discussion nor exploration of other work options." (*Id.*)

Although Defendant cites Plaintiff's own deposition for the proposition that Dr. Meskin's other prescribed restrictions were also discussed at the meeting, Plaintiff merely testified at his deposition that he could not recall whether other restrictions were discussed. (*See* Aki Dep. at 99–101.)  Plaintiff has now stated definitively that the February 10 meeting did not include a full discussion of his doctor's proposed restrictions.  Beyond the citations to Plaintiff's deposition, Defendant fails to present any admissible evidence disputing Plaintiff's contention that the steel-toed boots was the only restriction discussed at the February 10 meeting.

### ii.      Other Available Jobs

Plaintiff also contends that LBNL "never said they were going to look for other jobs, [and] no other jobs were discussed." (Aki Decl. ¶ 10.)  He claims that he "never told anyone at that meeting that [he] had no other job skills, because the subject never came up." (*Id.*)  This statement, however, appears inconsistent with his deposition testimony, where Plaintiff admitted that Serafino explained how LBNL would help him look for another available job, and that they discussed Plaintiff's job skills apart from carpentry.  (Aki Dep. at 101:9–102:6.)  When questioned specifically, Plaintiff did not recall if Serafino asked if he "had any other skills," but "more than likely she did." (Id. at 101:22–23.)  Similarly, while not explicitly admitting to telling Serafino that he did not have any skills other than working in "the trades," Plaintiff agreed that this was an accurate assessment and is something he "would probably say." (Id. at 101:24–102:5.)

Although Plaintiff's contradictions weaken his position as to whether alternative job positions were discussed, Defendant has not produced any admissible evidence showing that it actually searched for vacant job positions at LBNL for which Plaintiff would qualify.  Rather, Defendant's counsel attaches a document to her declaration—Exhibit G—that purports to be a list of available jobs at LBNL in February 2012, along with the Jang Letter, which states that, as of April 9, 2012, LBNL was "unable to identify a different position for which [Plaintiff] might be suitable." (Dkt. No. 27-2 Ex. H.)  Even if Exhibit G were admissible—which, as discussed above, it is not—the document says nothing about whether Defendant actually considered the list of jobs before terminating Plaintiff.  Moreover, the Jang Letter's assertion that Defendant was unable to

identify other jobs is a statement by an out-of-court declarant offered for its truth and, therefore, hearsay that does not fall within any exception.  *See* Fed. R. Evid. 801–802.

Viewing the evidence in the record in the light most favorable to Plaintiff, the Court cannot say as a matter of law that LBNL participated in the interactive process in good faith.  Defendant has failed to demonstrate that it consulted and cooperated with Plaintiff such that the parties could discover Plaintiff's precise limitations and effective accommodations.  As noted above, the record supports a finding that the only limitation identified and discussed at any point was the limitation on wearing steel-toed boots; however, LBNL's purported determination that no reasonable accommodation existed was based on all four of the restrictions identified in Dr. Meskin's work status report.  Despite Plaintiff informing LBNL at the February 10 meeting that the only accommodation he required was an alternative work boot, LBNL failed to follow up on this contradiction between Dr. Meskin's work status report and Plaintiff's own assertions of his limitations.

Further, Plaintiff asserts that there was never any discussion about his skills or job openings for which he might be qualified.  (Aki Decl. ¶ 10.)  While Plaintiff's testimony is somewhat inconsistent in this regard, Defendant has not submitted any admissible evidence showing that it helped Plaintiff identify potential accommodations by searching for other job openings at LBNL.  Because a reasonable jury could conclude that LBNL failed to adequately engage with Plaintiff in "identify[ing] the precise limitations resulting from the disability and potential reasonable accommodations," 29 C.F.R. § 1630.2(o)(3), the Court cannot conclude that LBNL participated in the interactive process in good faith as a matter of law.  "Plaintiff's evidence creates a triable issue as to whether [Defendant] rejected Plaintiff's proposed accommodation[] and offered no practical alternatives in response."  *See Kirbyson v. Tesoro Ref. & Mktg. Co.*, 795 F. Supp. 2d 930, 945 (N.D. Cal. 2011).

### 2.      Reasonable Accommodations

Given Defendant's failure to establish that a reasonable jury would have to find that it engaged in the interactive process in good faith, Defendant must show the nonexistence of a reasonable accommodation.  *See Morton*, 272 F.3d at 1256.  Defendant has failed to do so.  Defendant argues that no reasonable accommodation was available to Plaintiff because his work

United States District Court
Northern District of California

restrictions, as identified in Dr. Meskin's work status report, show that Plaintiff was unable to perform the "essential functions" of the job. Defendant also appears to argue that any of Plaintiff's proposed accommodations—which include allowing Plaintiff to wear non-steel-toed boots, placing Plaintiff on temporary light duty assignments, and modifying the carpenter position (*see* Dkt. No. 29 at 9–10)—are unreasonable because Dr. Meskin's work status report described Plaintiff's limitations as "permanent." However, it is disputed whether Plaintiff's workplace abilities were actually as limited as stated in Dr. Meskin's work status report. As noted above, Plaintiff asserts that he could have worked in his current job if he was merely allowed to wear different work boots and, in fact, did so. (Aki Decl. ¶ 10.) Defendant has not shown—or even argued—that such a minimal accommodation was an undue burden.

Even assuming Plaintiff's limitations were as described in Dr. Meskin's report, Defendant provides no admissible evidence supporting its contention that Plaintiff could not be reassigned to a vacant position. The inadmissible evidence Defendant does submit is, in any event, unavailing: Exhibit G—the spreadsheet of available jobs in February 2012 attached to Defendant's counsel's declaration—is provided unexplained. Presumably, Defendant expects the Court to infer that someone at LBNL inspected the list of available jobs and assessed those openings against Plaintiff's skills and his limitations, as identified in Dr. Meskin's work status report, and concluded that there was no match. However, in the absence of any declaration from an LBNL employee with personal knowledge stating that such an assessment occurred, the Court cannot draw that inference in Defendant's favor.

Lastly, Defendant argues that because there was no dispute between Plaintiff and LBNL at the conclusion of the February 10 meeting, LBNL had no obligation to take further action. Specifically, Defendant relies on the fact that Plaintiff did not express disagreement with the assessment that—if Plaintiff had no skills outside "the trades" and LBNL could not find another job available for him—the next step would be medical separation. (Aki Dep. at 103:2–18.) This argument is equally unavailing. First, Plaintiff elaborated that the reason he agreed with LBNL's assessment was because he "couldn't wear steel-toed boots any longer and that's the sum of it." (*Id.* at 103:18–19.) This is consistent with his claim that the boots were the only accommodation discussed, and that he could have continued working had he been allowed to wear different work

United States District Court
Northern District of California

boots.  Even without this elaboration, however, Plaintiff's agreement means nothing without proof that LBNL personnel evaluated Plaintiff's skills and compared them against available jobs.  As discussed above, Defendant has failed to produce any such evidence.

Because Defendant has failed to show that, as a matter of law, no reasonable accommodation was available to Plaintiff, Defendant's Motion for Summary Judgment on this claim is DENIED.

### 3.      Compensatory Damages – Deliberate Indifference

Aside from liability, Defendant seeks summary judgment on all of Plaintiff's damage claims arising from a Rehabilitation Act violation.  Specifically, Defendant asserts that based on the undisputed evidence, Plaintiff "cannot establish *intentional* discrimination on the basis of his alleged disability, an element necessary for [Plaintiff] to recover monetary damages for his claims under the Rehabilitation Act."  (Dkt. No. 27 at 11.)

Compensatory damages are not available under Section 504 of the Rehabilitation Act "absent a showing of discriminatory intent."  *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998).  The Ninth Circuit analyzes discriminatory intent in such actions under the standard of "deliberate indifference."  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). Deliberate indifference requires: (1) "knowledge that a harm to a federally protected right is substantially likely," and (2) a "failure to act upon that likelihood."  *Id.* at 1139; *see also Curry v. Tilton*, No. C-07-0775 EMC PR, 2012 WL 967062, at *9 (N.D. Cal. Mar. 21, 2012).

The first prong is satisfied when the plaintiff identifies a specific, reasonable and necessary accommodation that the entity has failed to provide, and the plaintiff notifies the entity of the need for accommodation or the need is obvious or required by statute or regulation.  *Duvall*, 260 F.3d at 1139.  Here there is no question that LBNL had notice, as Dr. Meskin's work status report and the February 10 meeting were all centered on Plaintiff's need for a work accommodation.

The second prong of deliberate indifference is satisfied by showing that the entity deliberately failed to fulfill its duty to act in response to a request for accommodation.  *Id.* at 1139–40.  The entity's duty is to undertake a fact-specific investigation to gather from the disabled individual and qualified experts sufficient information to determine what constitutes a reasonable accommodation, giving "primary consideration" the requests of the disabled individual.  *Id.* at

16

1139.  The second prong is not satisfied if the failure to fulfill this duty to accommodate is a result of mere negligence, such as "bureaucratic slippage" or where the entity simply "overlooked" a duty to act.  *Id.* at 1139–40.

Here, given the dispute of material fact as to what occurred at the February 10 meeting and what efforts LBNL made to seek a reasonable accommodation, the Court cannot rule as a matter of law that Defendant met its duty.  If Plaintiff's "account of the timing and content of his requests for accommodation and [D]efendant['s] reactions thereto are accurate, a trier of fact could conclude that [D]efendant['s] decisions not to accommodate him were considered and deliberate." *See id.* at 1141; *see also S. L.-M. v. Dieringer Sch. Dist. No. 343*, 614 F. Supp. 2d 1152, 1163, (W.D. Wash. 2008) ("Drawing all reasonable inferences in [plaintiff's] favor, these instances, in aggregate, might lead a reasonable jury to conclude that [defendant's] conduct was 'deliberately indifferent.'").  The inquiry into deliberate indifference is "nuanced and fact-intensive—precisely the province of the jury." *Button v. Bd. of Regents of Univ.*, 289 F.2d 964, 968 (9th Cir. 2008).

Thus, the disputed issues of material fact preclude summary judgment on the issue of compensatory damages, and the Court DENIES Defendant's Motion as it pertains to Plaintiff's damage claims.

### B.        Retaliation (Third Cause of Action)

The Rehabilitation Act incorporates the ADA's prohibition against retaliation, which provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a); *see also* 29 C.F.R. § 1630.12(a).  To establish a prima facie case of retaliation under the Rehabilitation Act, "the employee must establish that: (1) he or she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two."  *Pardi v. Kaiser Permanente Hosp., Inc.*, 389 F.3d 840, 849 (9th Cir. 2004); *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).

The plaintiff has the burden to present evidence that establishes a link between his protected activity and any adverse employment action.  *Coons v. Sec'y of the U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2003).  "Once the plaintiff establishes a prima facie case,

United States District Court
Northern District of California

the employer has the burden to present legitimate reasons for the adverse employment action." *Id.* "If the employer carries this burden, and plaintiff demonstrates a genuine issue of material fact as to whether the reason advanced by the employer was a pretext, then the retaliation case proceeds beyond the summary judgment stage." *Id.*

### 1.    Protected Activity

Plaintiff sets forth three protected activities as the basis for his retaliation claim: (1) his disability grievance filed with union representative Morman in June 2010; (2) his discrimination complaint filed with the DFEH in June 2010; and (3) his request for accommodations following surgery in February 2012.[6]  (Dkt. No. 29 at 11.)  Defendant only challenges the validity of the second alleged activity, arguing that there is no admissible evidence showing LBNL ever received notice of Plaintiff's DFEH complaint.  (Dkt. No. 31 at 6.)  Specifically, Defendant maintains that the DFEH "Right to Sue" notice attached to the Aki Declaration has not been properly authenticated, and that the notice itself states that the agency did "not serve these documents on the employer."  (*Id.*; Dkt. No. 30 Ex. C.)

While the DFEH complaint was never authenticated through personal knowledge, it appears to be a genuine document and is therefore admissible under Federal Rule of Evidence 901(b)(4).  *See* Fed. R. Evid. 901(b)(4); *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 533 (9th Cir. 2011) ("[W]here personal knowledge is not relied upon to authenticate the document, the district court must consider alternative means of authentication under Federal Rules of Evidence 901(b)(4).").  The DFEH complaint itself is sufficient evidence that Plaintiff engaged in a protected activity, but the question of whether or not LBNL received notice of the complaint is an issue of causation, and is further discussed below.  *See Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.").

---

[6] There is no question that these three constitute protected activities.  *See Pardi v. Kaiser Permanente Hosp., Inc.*, 389 F.3d 840, 850 (9th Cir. 2004) (union grievances are protected activities); *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 919 (9th Cir. 1996) (DFEH complaints are protected activities); *Coons v. Sec'y of the U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2003) (requests for reasonable accommodations are protected activities).  Because Plaintiff's complaint to his union representative and the complaint to the DFEH were filed on the same day and based on the same underlying facts—and because Plaintiff has alleged no adverse action that independently arose from either—the Court will examine both complaints in unison.

United States District Court
Northern District of California

### 2.      Adverse Employment Action

An "adverse employment action" is "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party from engaging in protected activity." *Ray*, 217 F.3d at 1242–43. "Examples of adverse employment actions include termination of employment, demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits or diminished responsibilities." *Dumas v. New United Motor Mfg. Inc.*, No. C 05-4702 PJH, 2007 WL 1223806, at *7 (N.D. Cal. Apr. 24, 2007). "[N]ot every disagreeable workplace action constitutes retaliation; rather, retaliation must produce an injury or harm." *Hellman v. Weisberg*, 360 Fed. Appx. 776, 778 (9th Cir. 2009) (internal quotation marks omitted) (concluding that any "snubbing" experienced by the plaintiff did not rise to the level of an adverse employment action). Ostracism by coworkers does not constitute an adverse employment action so long as it does not have an effect on the employee's ability to perform their job. *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000).

Plaintiff alleges three events that could constitute an "adverse action:" (1) his medical separation/termination from LBNL; (2) LBNL's failure to accommodate following his surgery; and (3) his loss of an assigned tool truck and the change in attitude from his supervisors.[7] (Dkt. No. 29 at 11.)

### 3.      Causal Link

The crux of the retaliation claim ultimately depends on Plaintiff's burden to establish a link between a protected activity and any adverse employment action. *See Coons*, 383 F.3d at 887. Sweeping conclusory allegations are not sufficient to defeat summary judgment; rather, a plaintiff must "set forth specific facts" as to how a defendant violated his rights. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). For a plaintiff to establish a causal connection between the protected activity and the adverse employment action, he must prove that the person taking the adverse

---

[7] Termination is undoubtedly an adverse action, and because LBNL's alleged failure to accommodate is what ultimately led to Plaintiff's termination, the Court will address the two actions in tandem. The Court is also persuaded that Plaintiff's purported loss of an assigned truck is an adverse action, as such a loss would make it much more difficult for Plaintiff to get to job sites around LBNL's 200-acre property. However, the "change in attitudes"—while demonstrative of a causal link if sufficiently alleged—is not an adverse action where it did not affect Plaintiff's ability to perform his job. *See Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000).

employment action knew about the plaintiff's protected activity at the time he made the adverse decision.  *See Cohen*, 686 F.2d at 796–97 (finding no causal link where the decision-maker did not know about the protected activity at the time he decided to take adverse employment action, even though company vice president had knowledge of the activity).  Thus, Plaintiff can establish causation by showing that: "(1) one of the decision makers responsible for each of the adverse employment actions taken against Plaintiff had knowledge that Plaintiff had engaged in protected activity, and (2) there is close proximity in time between the protected activity and the adverse employment action."  *Ferretti v. Pfizer Inc.*, No. 11-CV-04486, 2013 WL 140088, at *10 (N.D. Cal. Jan. 10, 2013).

Plaintiff does not tie any specific protected activity to an adverse action, and simply alleges that but for engaging in "protected activity," each of the adverse actions would not have occurred.  (Dkt. No. 29 at 12.)  Because Plaintiff has failed to allege specific facts that establish a causal link, as explained below, the Court concludes summary judgment is proper on this claim.

### i.   *Medical Separation & Failure to Accommodate*

As to the first protected activity, Plaintiff has failed to establish a direct causal link between the complaints filed in June 2010 and LBNL's medical separation in April 2012.  Without evidence of a retaliatory motive, the "distant time sequence" between June–July 2010 and April 2012 is "inadequate to show a causal link between his protected activity . . . and the adverse employment action he suffered."  *See Coons*, 383 F.3d at 887 (finding a full year between the plaintiff's request for accommodations and his demotion to be insufficient to establish a causal link); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) ("Action taken . . . 20 months later suggests, by itself, no causality at all.").  While the lack of temporal proximity is not dispositive on its own, a plaintiff must offer "evidence to support the inference of a retaliatory motive," such as "circumstantial evidence of a 'pattern of antagonism' following the protected conduct."  *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005).  Plaintiff has introduced no such evidence, as his "allegations contain no reference to specific events or people such that they could be weighed against [Defendant's] legitimate reasons for taking adverse action against [Plaintiff]."  *See Means v. City & Cnty. of San Francisco*, 749 F. Supp. 2d 998, 1007 (N.D. Cal. 2010).

United States District Court
Northern District of California

United States District Court
Northern District of California

Moreover, Plaintiff has introduced no evidence that shows any of the LBNL personnel responsible for his termination decision had actual knowledge of the DFEH complaint Plaintiff filed in June 2010.  Plaintiff claims that LBNL was copied with the complaint in July 2010, pointing to the second page of the DFEH's right to sue letter that contains the address of LBNL's Human Resources Department under a "CC" caption.  (Aki Decl. ¶ 7; Dkt. No. 30 Ex. C.)  The language in the DFEH letter sent to Plaintiff's counsel, however, states that the DFEH would "not serve these documents on the employer."  (Dkt. No. 30 Ex. C.)  While the DFEH letter may be referring to legal service rather than mere notice, Plaintiff has still failed to link that letter to anyone responsible for the decision to medically separate him.  Although Plaintiff's deposition indicates that a lawsuit was subsequently filed in state court in the summer of 2010, Plaintiff only testified that he "might" have told his supervisor Tully about it, and that he was not sure.  (Aki Dep. at 111:7–21.)  Most importantly, at his deposition Plaintiff testified that he had no reason to believe LBNL treated him differently as a result of his complaint.  (Aki Dep. at 111:22–24.)  In short, Plaintiff has failed to provide any evidence supporting a finding of a causal link between the DFEH complaint and his medical separation.

Alternatively, to establish a causal link between his request for accommodations in February 2012 and his medical separation in April 2012, Plaintiff would have to show that LBNL "failed to accommodate h[im] . . . in retaliation for requesting an accommodation."  *See Fowler v. Potter*, No. C 06-04716 SBA, 2008 WL 2383073, at *8 (N.D. Cal. June 9, 2008).  However, Plaintiff cannot use the mere failure to accommodate as an act or omission supporting a retaliation claim, "[o]therwise, every alleged failure to accommodate would be deemed a retaliatory act."  *Id.*  Once again, Plaintiff has introduced no evidence to suggest a retaliatory motive or link between his request for accommodations and the denial of that request.

For the reasons stated above, Plaintiff has failed to establish a *prima facie* retaliation claim based on LBNL's decision to terminate his employment.

### ii.        *Loss of Tool Truck*

Plaintiff additionally alleges that his superiors retaliated against him for filing the DFEH complaint by taking away his tool truck and "exhibiting negative attitudes toward him that made his job more difficult."  (Dkt. No. 29 at 11–12; Aki Decl. ¶ 8.)  While the change in attitudes is not

United States District Court
Northern District of California

an adverse action in itself, it can serve as proof of a causal link if properly alleged.  However, there are several causal deficiencies that preclude this argument from surviving summary judgment.

As stated above, a plaintiff can establish causation by showing that: "(1) one of the decision makers responsible for each of the adverse employment actions taken against Plaintiff had knowledge that Plaintiff had engaged in protected activity, and (2) there is close proximity in time between the protected activity and the adverse employment action." *See Ferretti*, 2013 WL 140088, at *10.  Plaintiff fails to produce evidence that any of the decision-makers responsible the loss of his assigned tool truck had knowledge of Plaintiff's DFEH complaint.  Plaintiff has not supplied the name of the supervisor who took away Plaintiff's truck, or the date when this occurred.  Nor has Plaintiff identified any of the supervisors whose "attitudes changed," or specific events to infer a pattern of antagonism.  "These undetailed allegation[s] do not suffice to prevent the granting of summary judgment in favor of [D]efendant." *See Jordan v. Graziani*, No. C03-2414 RMW PR, 2008 WL 3823032, at *3 (N.D. Cal. Aug. 13, 2008).  Thus, Plaintiff has failed to produce evidence supporting a finding of a causal link between his protected activity and the loss of his assigned tool truck.

For the reasons explained above, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's third cause of action.

**D.      State Law Claims (Fourth and Fifth Causes of Action)**

Defendant argues that Plaintiff's state law claims for alleged violations of the California Confidentiality of Medical Information Act and the California Constitution are barred by both the Eleventh Amendment and the relevant statutes of limitation.  (Dkt. No. 27 at 11–13.)  Plaintiff states no opposition to Defendant's Motion for Summary Judgment on his state law claims.  (Dkt. No. 29 at 2.)  Based on Plaintiff's non-opposition, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's fourth and fifth causes of action.

CONCLUSION

For the reasons explained above, the Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment.  Specifically, the Court GRANTS the Motion with respect to Plaintiff's third, fourth, and fifth claims, and DENIES the Motion with regard to

Plaintiff's claim for failure to accommodate under the Rehabilitation Act. The Court also DENIES Defendant's Motion with respect to Plaintiff's claim for compensatory damages.

The pretrial conference is set for January 8, 2015 with trial scheduled to commence on January 20, 2015. The parties have been ordered to a settlement conference with Magistrate Judge Bernard Zimmerman on December 29, 2014. Settlement was to have occurred in October 2014, but was cancelled due to Plaintiff's failure to submit a settlement conference statement and the inability to reschedule the settlement in a timely manner. The upshot is that the parties' pretrial filings will be due, or at least need to be substantially prepared, before the settlement conference. Accordingly, the Court is continuing the trial to February 9, 2015 and the pretrial conference to January 29, 2015 at 2:00 p.m.

**IT IS SO ORDERED**.

Dated: November 25, 2014

JACQUELINE SCOTT CORLEY
United States Magistrate Judge